# PENSION BENEFIT GUARANTY CORPORATION *v.* R. A. GRAY & CO.

No. 83–245.   Argued April 16, 1984—Decided June 18, 1984*

_____

*Together with No. 83–291, *Oregon-Washington Carpenters-Employers Pension Trust Fund* v. *R. A. Gray & Co.,* also on appeal from the same court.

718

*Baruch A. Fellner* argued the cause for appellants in both cases. With him on the briefs for appellant in No. 83–245 were *Henry Rose, Mitchell L. Strickler, J. Stephen Caflisch, Peter H. Gould, David F. Power, Nathan Lewin,* and *Seth P. Waxman. William B. Crow, James N. Westwood, William H. Walters,* and *David S. Paull* filed briefs for appellant in No. 83–291.

*Thomas M. Triplett* argued the cause and filed a brief for appellee.†

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented by these cases is whether application of the withdrawal liability provisions of the Multi-

---

†*Gerald M. Feder* filed a brief for the National Coordinating Committee for Multiemployer Plans as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for G & R Roofing Co. by *Michael E. Merrill, Stephen J. Schultz,* and *Mark T. Bennett;* for the National Association of Wholesaler-Distributors by *Harold T. Halfpenny;* for the National Association of Manufacturers by *Chester W. Nosal, John R. Keys, Jr., Jan S. Amundson,* and *Quentin Riegel;* for the National-American Wholesale Grocers' Association by *William H. Borghesani, Jr.,* and *Peter A. Susser;* for the National Steel Service Center, Inc., by *Ralph T. DeStefano* and *Richard R. Riese;* for Republic Industries, Inc., by *Philip B. Kurland, Christopher G. Walsh, Jr., Lester M. Bridgeman,* and *Louis T. Urbanczyk;* for Sibley, Lindsay & Curr Co. by *William L. Dorr;* and for Transport Motor Express, Inc., et al. by *Harris Weinstein.*

*Jack L. Whitacre* and *Stephen A. Bokat* filed a brief for the Chamber of Commerce of the United States as *amicus curiae.*

employer Pension Plan Amendments Act of 1980 to employers withdrawing from pension plans during a 5-month period prior to the statute's enactment violates the Due Process Clause of the Fifth Amendment. We hold that it does not.

## I

## A

In 1974, after careful study of private retirement pension plans, Congress enacted the Employee Retirement Income Security Act (ERISA), 88 Stat. 829, 29 U. S. C. § 1001 *et seq.* Among the principal purposes of this "comprehensive and reticulated statute" was to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans. *Nachman Corp.* v. *Pension Benefit Guaranty Corp.*, 446 U. S. 359, 361–362, 374–375 (1980). See *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S. 504, 510–511 (1981). Congress wanted to guarantee that "if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Nachman, supra,* at 375; *Alessi, supra,* at 510.

Toward this end, Title IV of ERISA, 29 U. S. C. § 1301 *et seq.*, created a plan termination insurance program, administered by the Pension Benefit Guaranty Corporation (PBGC), a wholly owned Government corporation within the Department of Labor, § 1302. The PBGC collects insurance premiums from covered pension plans and provides benefits to participants in those plans if their plan terminates with insufficient assets to support its guaranteed benefits. See §§ 1322, 1361. For pension plans maintained by single employers, the PBGC's obligation to pay benefits took effect immediately upon enactment of ERISA in 1974. §§ 1381(a), (b). For multiemployer pension plans, however, the payment of guaranteed benefits by the PBGC was not to become mandatory until January 1, 1978. § 1381(c)(1).

During the intervening period, the PBGC had discretionary authority to pay benefits upon the termination of multiemployer pension plans. §§ 1381(c)(2)–(4). If the PBGC exercised its discretion to pay such benefits, employers who had contributed to the plan during the five years preceding its termination were liable to the PBGC in amounts proportional to their share of the plan's contributions during that period. § 1364. In other words, any employer withdrawing from a multiemployer plan was subject to a contingent liability that was dependent upon the plan's termination in the next five years and the PBGC's decision to exercise its discretion and pay guaranteed benefits. In addition, any individual employer's liability was not to exceed 30% of the employer's net worth. § 1362(b)(2).

As the date for mandatory coverage of multiemployer pension plans approached, Congress became concerned that a significant number of plans were experiencing extreme financial hardship. This, in turn, could have resulted in the termination of numerous plans, forcing the PBGC to assume obligations in excess of its capacity. To avoid this potential collapse of the plan termination insurance program, Congress deferred mandatory insurance coverage for multiemployer plans for 18 months—until July 1, 1979—extending the PBGC's discretionary authority to insure plans terminating during the interim. Pub. L. 95–214, 91 Stat. 1501.[1] The PBGC was also directed to prepare a comprehensive report analyzing the problems faced by multiemployer plans and recommending appropriate legislative action. See S. Rep. No. 95–570, pp. 1–4 (1977); H. R. Rep. No. 95–706, p. 1

---

[1] The effective date for mandatory insurance coverage of multiemployer plans was subsequently deferred to May 1, 1980, Pub. L. 96–24, 93 Stat. 70, to July 1, 1980, Pub. L. 96–239, 94 Stat. 341, and finally to August 1, 1980, Pub. L. 96–293, 94 Stat. 610. On each occasion, Congress was providing more time for thorough consideration of the complex issues posed by the termination of multiemployer pension plans. Ultimately, mandatory insurance coverage was superseded by the Multiemployer Pension Plan Amendments Act of 1980, Pub. L. 96–364, 94 Stat. 1208.

(1977). In this way, Congress created "time to legislate, if necessary, before the mandatory coverage comes into effect." 123 Cong. Rec. 36800 (1977) (statement of Sen. Williams); *id.*, at 36800–36802.

The PBGC issued its report on July 1, 1978. Pension Benefit Guaranty Corporation, Multiemployer Study Required by P. L. 95–214 (1978). Among its principal findings was that ERISA did not adequately protect plans from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans. As the report summarized:

> "The basic problem with the withdrawal rules is that they are designed primarily to protect PBGC. They do not provide an efficient mechanism for reducing the burden of withdrawal on the plan and remaining employers. They may even encourage withdrawals in some instances (*e. g.*, where termination may be imminent). Changes in the withdrawal rules should be considered:
>
> "(1) to provide relief to plans without increasing the burden on the insurance system,
>
> "(2) to provide a disincentive to voluntary employer withdrawals,
>
> "(3) to reduce or remove disincentives to plan entry, and
>
> "(4) to work with, instead of against, the termination liability provisions." *Id.*, at 96–97.[2]

---

[2] Congressional testimony by the Executive Director of the PBGC further explained the problems caused by employers withdrawing from multiemployer plans:

"A key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the

To alleviate the problem of employer withdrawals, the PBGC suggested new rules under which a withdrawing employer would be required to pay whatever share of the plan's unfunded vested liabilities was attributable to that employer's participation. *Id.*, at 97–114.[3] These tentative proposals were included in policy recommendations submitted to Congress on February 27, 1979, and were incorporated in proposed legislation that the Executive Branch formally sent to Congress three months later, S. 1076, 96th Cong., 1st Sess. (1979). Most significantly for present purposes, the bill included an effective date for withdrawal liability of February 27, 1979—the date on which the PBGC had initially submitted its recommendations to Congress. *Id.*, § 108. This date was chosen to prevent employers from avoiding the adverse consequences of withdrawal liability by withdrawing from plans while such liability was being considered by Congress. As one Senator noted, the retroactive effective date was designed "to prevent . . . the withdrawal of these opportunistic employers without imposition of liability" and was to

---

inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue." Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2nd Sess., 22 (1978) (statement of Matthew M. Lind).

[3] Again, the PBGC's Executive Director provided a more elaborate explanation:

"To deal with this problem, our report considers an approach under which an employer withdrawing from a multiemployer plan would be required to complete funding its fair share of the plan's unfunded liabilities. In other words, the plan would have a claim against the employer for the inherited liabilities which would otherwise fall upon the remaining employers as a result of the withdrawal. . . .

"We think that such withdrawal liability would, first of all, discourage voluntary withdrawals and curtail the current incentives to flee the plan. Where such withdrawals nonetheless occur, we think that withdrawal liability would cushion the financial impact on the plan." *Id.*, at 23 (statement of Matthew M. Lind).

serve "as a deterrent to hasty employer withdrawal." 126 Cong. Rec. 20234 (1980) (remarks of Sen. Matsunaga).

Congress debated the issue of withdrawal liability for the remainder of 1979 and much of 1980. By April 1980, two Committees in the House and one in the Senate had approved substantially similar versions of the bill, each containing the February 27, 1979, effective date for withdrawal liability. The Senate Finance Committee had not yet completed its work on the bill, however, and sought more time for consideration of the legislation. See *supra*, at 721, and n. 1. At the same time, the Senate advanced the effective date for imposing withdrawal liability to April 29, 1980. As Senator Javits later explained:

> "The committees decided in part to move up the date from February 27, 1979, the date contained in earlier versions of the bill, because the original purpose of a retroactive effective date—namely, to avoid encouragement of employer withdrawals while the bill was being considered—has been achieved. It should also be noted that the April 29 effective date is the product of strong political pressures by certain withdrawing employers who were caught by the earlier date. I realize that permitting these employers to avoid liability only increases the burdens of those employers remaining with the plans in question, but it appears necessary to accept the April 29 date in order to enact the bill before the August 1 deadline for action." 126 Cong. Rec. 20179 (1980) (statement of Sen. Javits).

See also *id.*, at 9236–9237 (statement of Sen. Bentsen).

The House unanimously passed its version of the bill, including the February 27, 1979, effective date, in May 1980. *Id.*, at 12233. The Senate version, adopting an effective date of April 29, 1980, was endorsed by a vote of 85–1. *Id.*, at 20247. The Conference Committee accepted the Senate's effective date, and the legislation was signed into law by

the President on September 26, 1980. Multiemployer Pension Plan Amendments Act of 1980 (MPPAA or Act), Pub. L. 96–364, 94 Stat. 1208. As enacted, the Act requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan. This withdrawal liability is the employer's proportionate share of the plan's "unfunded vested benefits," calculated as the difference between the present value of vested benefits and the current value of the plan's assets. 29 U. S. C. §§ 1381, 1391. Pursuant to 29 U. S. C. § 1461(e), these withdrawal liability provisions took effect on April 29, 1980, approximately five months before the statute was enacted into law.

## B

Appellee R. A. Gray & Co. (Gray) is a building and construction firm doing business in Oregon. Under a series of collective-bargaining agreements with the Oregon State Council of Carpenters (Council), Gray contributed to the Oregon-Washington Carpenters-Employers Pension Trust Fund (Pension Plan), a multiemployer pension plan under 29 U. S. C. § 1301(a)(3). During February 1980, Gray advised the Council that it would be terminating their collective-bargaining agreement when it expired on June 1, 1980. Gray continued to engage in the building and construction industry, however, and therefore was deemed to have completely withdrawn from the Pension Plan pursuant to § 1383(b).

The Pension Plan subsequently notified Gray that, by completely withdrawing from the plan on June 1, 1980, it had incurred a withdrawal liability of $201,359. The notice set forth a schedule of quarterly payments and demanded payment in accordance with that schedule. After some preliminary correspondence between Gray and the plan's trustees, the Pension Plan informed Gray that it was delinquent in its payments. Gray thereafter filed suit in the United States District Court for the District of Oregon, seeking

declaratory and injunctive relief against the Pension Plan and the PBGC.[4]

Gray's complaint raised several constitutional claims, including a challenge to the retroactive application of the MPPAA under the Due Process Clause of the Fifth Amendment.[5] In particular, Gray noted that its June 1, 1980, withdrawal from the Pension Plan occurred during the 5-month period preceding enactment of the MPPAA, and therefore was directly affected by the retroactivity provision included in the Act. Moreover, Gray contended, retroactive application of withdrawal liability could not be sustained under the Due Process Clause because it was arbitrary and irrational, and because it impaired the collective-bargaining agreements that Gray had signed with the Council.

---

[4] Gray also moved for a preliminary injunction to restrain the Pension Plan from taking any further steps to collect the withdrawal liability it assessed. The District Court denied that motion. App. 50–57.

At the same time, Gray requested that the Pension Plan review its determination of withdrawal liability. See 29 U. S. C. § 1399(b)(2). In response, the Pension Plan issued a "Decision on Review," concluding that it had "accurately determined: (1) the method for allocating the unfunded vested benefits to Gray, (2) the amount of the Plan's unfunded vested benefits, (3) the schedule of payments offered to Gray, and (4) the date of Gray's complete withdrawal." 549 F. Supp. 531, 534 (Ore. 1982). Although Gray could have initiated arbitration with the Pension Plan on these issues, 29 U. S. C. § 1401(a), it accepted these findings and waived its right to arbitration, 549 F. Supp., at 534.

[5] Gray also contended, *inter alia*, that the different treatment afforded employers participating in multiemployer pension plans as opposed to employers participating in single-employer pension plans violates the equal protection component of the Fifth Amendment, that retroactive application of the MPPAA violates the *Ex Post Facto* Clause included in Art. I, § 9, of the Constitution, and that the Act's arbitration provisions violated Gray's rights to procedural due process and trial by jury. The District Court rejected the first two claims, see 549 F. Supp., at 538–539, and refused to reach the last claim because Gray had waived its right to arbitration, *id.*, at 539; n. 4, *supra*. These issues were not reached by the Court of Appeals, *Shelter Framing Corp.* v. *Pension Benefit Guaranty Corp.*, 705 F. 2d 1502, 1515 (CA9 1983), and are not now pressed before this Court.

The District Court rejected Gray's due process claim, and granted summary judgment in favor of the Pension Plan and the PBGC. 549 F. Supp. 531 (1982). Specifically, the court analyzed the constitutionality of retroactively imposing withdrawal liability on employers by applying a four-part test established by the Court of Appeals for the Seventh Circuit in *Nachman Corp.* v. *Pension Benefit Guaranty Corp.*, 592 F. 2d 947 (1979), aff'd on statutory grounds, 446 U. S. 359 (1980). As that test requires, the court examined (1) the reliance interest of the affected parties, (2) whether the interest impaired is in an area previously subjected to regulatory control, (3) the equities of imposing the legislative burdens, and (4) the statutory provisions that limit and moderate the impact of the burdens imposed.[6] Under these criteria, the court concluded that Gray had not satisfied the heavy burden faced by parties attempting to demonstrate that Congress has acted arbitrarily and irrationally when enacting socioeconomic legislation.

The Court of Appeals for the Ninth Circuit reversed, although it too believed that the four-factor *Nachman* test was the appropriate standard to use when analyzing the constitutionality of retroactive legislation enacted by Congress. *Shelter Framing Corp.* v. *Pension Benefit Guaranty Corp.*,

[6] The court in *Nachman* developed this four-part test for reviewing the constitutionality of retroactive legislation under the Fifth Amendment's Due Process Clause primarily by relying upon this Court's decisions in *Allied Structural Steel Co.* v. *Spannaus*, 438 U. S. 234 (1978), and *Railroad Retirement Board* v. *Alton R. Co.*, 295 U. S. 330 (1935). For reasons explained below, however, we do not believe that these cases control judicial review of retroactive federal legislation affecting economic benefits and burdens. See *infra*, at 732–734. We therefore reject the constitutional underpinnings of the analysis employed by the Court of Appeals in *Nachman*, although we have no occasion to consider whether the factors mentioned by that court might in some circumstances be relevant in determining whether retroactive legislation is rational. Cf. *Nachman Corp.* v. *Pension Benefit Guaranty Corp.*, 446 U. S. 359, 367–368, and n. 12 (1980) (explicitly limiting our review to the statutory question presented).

705 F. 2d 1502 (1983). In particular, the court concluded that retroactive application of withdrawal liability violated the Due Process Clause because employers had reasonably relied on the contingent withdrawal liability provisions included in ERISA prior to passage of the MPPAA, *id.*, at 1511–1512, and because the equities in this action generally favored Gray over the Pension Plan, *id.*, at 1512–1514

Both the Pension Plan and the PBGC invoked the appellate jurisdiction of this Court under 28 U. S. C. § 1252. We noted probable jurisdiction, 464 U. S. 912 (1983),[7] and now reverse.

## II

The starting point for analysis is our decision in *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1 (1976). In *Turner Elkhorn*, we considered a constitutional challenge to the retroactive effects of the Federal Coal Mine Health and Safety Act of 1969 as amended by the Black Lung Benefits Act of 1972. Under Title IV of that Act, coal mine operators were required to compensate former employees disabled by pneu-

---

[7] At least three Courts of Appeals, as well as numerous District Courts, have concluded that retroactive application of the MPPAA's withdrawal liability provisions satisfies constitutional standards. See, *e. g.*, *Textile Workers Pension Fund* v. *Standard Dye & Finishing Co.*, 725 F. 2d 843 (CA2 1984); *Peick* v. *Pension Benefit Guaranty Corp.*, 724 F. 2d 1247 (CA7 1983), cert. pending, No. 83–1246; *Republic Industries, Inc.* v. *Teamsters Joint Council*, 718 F. 2d 628 (CA4 1983), cert. pending, No. 83–541.

The prospective application of the MPPAA's withdrawal liability provisions has also been the subject of extensive nationwide litigation. All of the Courts of Appeals addressing the various constitutional challenges raised in those cases, however, have upheld the statute. See, *e. g.*, *The Washington Star Co.* v. *International Typographical Union Negotiated Pension Plan*, 235 U. S. App. D. C. 1, 729 F. 2d 1502 (1984); *Peick* v. *Pension Benefit Guaranty Corp.*, *supra; Republic Industries, Inc.* v. *Teamsters Joint Council*, *supra.* Because these issues were not addressed by the Court of Appeals, cf. n. 5, *supra*, and are not actively pursued by the parties before this Court, we assume for purposes of our decision in these cases that the prospective effects of the Act satisfy constitutional standards.

moconiosis even though those employees had terminated their work in the industry before the statute was enacted. We nonetheless had little difficulty in upholding the statute against constitutional attack under the Due Process Clause. As we initially noted:

> "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. See, e. g., *Ferguson* v. *Skrupa*, 372 U. S. 726 (1963); *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 487–488 (1955)." 428 U. S., at 15.

We further explained that the strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively. Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches:

> "[I]nsofar as the Act requires compensation for disabilities bred during employment terminated before the date of enactment, the Act has some retrospective effect— although, as we have noted, the Act imposed no liability on operators until [after its enactment]. And it may be that the liability imposed by the Act for disabilities suffered by former employees was not anticipated at the time of actual employment. But our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. See *Fleming* v. *Rhodes*, 331 U. S. 100 (1947); *Carpenter* v. *Wabash R. Co.*, 309 U. S. 23 (1940); *Norman* v. *Baltimore & Ohio R. Co.*, 294 U. S. 240 (1935); *Home Bldg. & Loan Assn.* v. *Blaisdell*, 290 U. S. 398 (1934); *Louisville*

*& Nashville R. Co.* v. *Mottley,* 219 U. S. 467 (1911). This is true even though the effect of the legislation is to impose a new duty or liability based on past acts. See *Lichter* v. *United States,* 334 U. S. 742 (1948); *Welch* v. *Henry,* 305 U. S. 134 (1938); *Funkhouser* v. *Preston Co.,* 290 U. S. 163 (1933)." *Id.,* at 15–16 (footnotes omitted).

To be sure, we went on to recognize that retroactive legislation does have to meet a burden not faced by legislation that has only future effects. "It does not follow . . . that what Congress can legislate prospectively it can legislate retrospectively. The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *Id.,* at 16–17. But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.

For example, in *Turner Elkhorn* we found that "the imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor—the operators and the coal consumers." *Id.,* at 18. Similarly, in these cases, a rational legislative purpose supporting the retroactive application of the MPPAA's withdrawal liability provisions is easily identified. Indeed, Congress was quite explicit when explaining the reason for the statute's retroactivity.

In particular, we believe it was eminently rational for Congress to conclude that the purposes of the MPPAA could be more fully effectuated if its withdrawal liability provisions were applied retroactively. One of the primary problems Congress identified under ERISA was that the statute encouraged employer withdrawals from multiemployer plans. And Congress was properly concerned that employers would have an even greater incentive to withdraw if they knew that legislation to impose more burdensome liability on withdraw-

ing employers was being considered. See 126 Cong. Rec. 20179 (1980) (statement of Sen. Javits); *id.*, at 20244 (remarks of Sen. Matsunaga). See also *supra*, at 723–724. Withdrawals occurring during the legislative process not only would have required that remaining employers increase their contributions to existing pension plans, but also could have ultimately affected the stability of the plans themselves. Congress therefore utilized retroactive application of the statute to prevent employers from taking advantage of a lengthy legislative process and withdrawing while Congress debated necessary revisions in the statute. Indeed, as the amendments progressed through the legislative process, Congress advanced the effective date chosen so that it would encompass only that retroactive time period that Congress believed would be necessary to accomplish its purposes. As we recently noted when upholding the retroactive application of an income tax statute in *United States* v. *Darusmont*, 449 U. S. 292, 296–297 (1981) *(per curiam)*, the enactment of retroactive statutes "confined to short and limited periods required by the practicalities of producing national legislation . . . is a customary congressional practice." We are loathe to reject such a common practice when conducting the limited judicial review accorded economic legislation under the Fifth Amendment's Due Process Clause.

## III

Gray and its supporting *amici* offer several reasons for subjecting the retroactive application of the MPPAA to some form of heightened judicial scrutiny. We are not persuaded, however, by any of their arguments.

First, Gray contends that retroactive legislation does not satisfy due process requirements unless persons affected by the legislation had "notice" of changing legal circumstances and "an opportunity to conform their conduct to the requirements of [the] new legislation." Brief for Appellee 20. We have doubts, however, that retroactive application of the

MPPAA would be invalid under the Due Process Clause for lack of notice even if it was suddenly enacted by Congress without any period of deliberate consideration, as often occurs with floor amendments or "riders" added at the last minute to pending legislation. But even assuming that advance notice of legislative action with retrospective effects is constitutionally compelled, cf. *Darusmont, supra,* at 299 (similarly assuming that notice is a relevant consideration), we believe that employers had ample notice of the withdrawal liability imposed by the MPPAA. Not only did ERISA itself impose contingent liability on withdrawing employers, but the various legislative proposals debated by Congress before enactment of the MPPAA uniformly included retroactive effective dates among their provisions. See *supra,* at 723–725.[8]

Second, it is suggested that we apply constitutional principles that have been developed under the Contract Clause, Art. I, § 10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . ."), when reviewing this federal legislation.[9] See, *e. g., Energy Resources*

---

[8] See, *e. g., Textile Workers Pension Fund* v. *Standard Dye & Finishing Co.,* 725 F. 2d, at 852 ("Notice was everywhere. . . . [Employers] withdrew from their funds not only when pervasive regulation, including withdrawal liability under ERISA, existed in the pension field, but also when the advent of the MPPAA was imminent"); *Peick* v. *Pension Benefit Guaranty Corp.,* 724 F. 2d, at 1269 ("[T]he intent of Congress to provide for the retrospective imposition of liability was quite clear from the very beginning of the legislative process. . . . [E]mployers who withdrew during [the retrospective] period cannot argue that they are now being required to pay wholly unanticipated liabilities") (footnote omitted).

[9] It could not justifiably be claimed that the Contract Clause applies, either by its own terms or by convincing historical evidence, to actions of the National Government. Indeed, records from the debates at the Constitutional Convention leave no doubt that the Framers explicitly refused to subject federal legislation impairing private contracts to the literal requirements of the Contract Clause:

"MR. GERRY entered into observations inculcating the importance of public faith, and the propriety of the restraint put on the states from im-

*Group, Inc.* v. *Kansas Power & Light Co.*, 459 U. S. 400 (1983); *Allied Structural Steel Co.* v. *Spannaus*, 438 U. S. 234 (1978). We have never held, however, that the principles embodied in the Fifth Amendment's Due Process Clause are coextensive with prohibitions existing against state impairments of pre-existing contracts. See, *e. g.*, *Philadelphia, B. & W. R. Co.* v. *Schubert*, 224 U. S. 603 (1912). Indeed, to the extent that recent decisions of the Court have addressed the issue, we have contrasted the limitations imposed on States by the Contract Clause with the less searching standards imposed on economic legislation by the Due Process Clauses. See *United States Trust Co.* v. *New Jersey*, 431 U. S. 1, 17, n. 13 (1977). And, although we have noted that retrospective civil legislation may offend due process if it is "particularly 'harsh and oppressive,'" *ibid.* (quoting *Welch* v. *Henry*, 305 U. S. 134, 147 (1938), and citing *Turner Elkhorn*, 428 U. S., at 14–20), that standard does not differ from the prohibition against arbitrary and irrational legislation that we clearly enunciated in *Turner Elkhorn.*

Finally, Gray urges that we resuscitate the Court's 1935 decision in *Railroad Retirement Board* v. *Alton R. Co.*, 295 U. S. 330, which invalidated provisions of the Railroad Retirement Act of 1934 that required employers to finance pensions for former railroad employees. Assuming, as we did in *Turner Elkhorn, supra*, at 19, that this aspect of *Alton* "retains vitality" despite the changes in judicial review of economic legislation that have occurred in the ensuing years, we again find it distinguishable from the present litigation. Unlike the statute in *Alton*, which created pensions for employees who had been fully compensated while working for

---

pairing the obligation of contracts; alleging that Congress ought to be laid under the like prohibitions. He made a motion to that effect. He was not seconded." 5 J. Elliot, Debates on the Federal Constitution 546 (2d ed. 1876).

See 2 M. Farrand, Records of the Federal Convention of 1787, p. 619 (1911).

the railroads, the MPPAA merely requires a withdrawing employer to compensate a pension plan for benefits that have already vested with the employees at the time of the employer's withdrawal.

## IV

We conclude that Congress' decision to apply the withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act to employers withdrawing from pension plans during the 5-month period preceding enactment of the Act is supported by a rational legislative purpose, and therefore withstands attack under the Due Process Clause of the Fifth Amendment. Accordingly, the judgment of the Court of Appeals is reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*