ANITA FOUNDATIONS INC., et al., Plaintiffs,

v.

ILGWU NATIONAL RETIREMENT FUND, et al., Defendants.

No. 87 Civ. 7242(KC).

United States District Court, S.D. New York.

April 20, 1989.

---

Norman Solovay and Clark S. Abrams, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for plaintiffs.

Marc E. Richards, Myerson & Kuhn, New York City, for defendants.

## OPINION AND ORDER

CONBOY, District Judge:

This is an action brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA").

## BACKGROUND

Plaintiffs are each corporations with principal places of business in the State of New York, and who were, at all times relevant to this action, engaged in the ladies' garment industry and employers under the provisions of ERISA and MPPAA. The IGLWU National Retirement Fund (the "Fund") is a New York trust created to provide pension benefits for workers in the garment industry based on employer contributions required by collective bargaining agreements entered between employers and local chapters of the ILGWU. The Fund is a "pension plan," an "employee pension benefit plan," an "employee pension benefit plan," and a "multiemployer plan" of sections 3(2) and 3(37) of ERISA, as amended by the MPPAA, 29 U.S.C. §§ 1002(2), (37). The individual defendants, Jay Mazur and Joseph Moore, were, at all relevant times, the co-trustees of the Fund.

Plaintiffs seek a declaratory judgment that the Fund and the defendant trustees who administer the Fund should be barred from reopening final settlements entered into with each plaintiff several years ago in which each plaintiff paid the full amount of adjusted "withdrawal liability" demanded by the defendants. When an employer withdraws from a multiemployer pension plan, it must pay a fixed and certain debt to the plan known as withdrawal liability. "This withdrawal liability is the employer's proportionate amount of unfunded vested benefits, calculated as the difference between the present value of the vested benefits and the plan's assets," and subject to various statutory deductions and limita-

tions. *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 725, 104 S.Ct. 2709, 2715, 81 L.Ed.2d 601 (1984); 29 U.S.C. § 1381 *et seq.* Plaintiffs have moved for summary judgment. Defendants have cross-moved for summary judgment, and in the event that either their motion is granted or all of the motions are denied, they have moved to amend their answer to add counterclaims for the additional withdrawal liability they contend is owed by the plaintiffs to the Fund.

The relevant facts are not in dispute, and are distilled below from the Local Rule 3(g) Statements of both sides. Prior to 1982, each of the plaintiffs made the contributions required of them to the Fund pursuant to collective bargaining agreements. During the period 1982 through 1985, however, the defendants learned that each of the plaintiff had completely withdrawn from the fund within the meaning of the MPPAA. The defendants then notified the plaintiffs that they had incurred withdrawal liability in the amount of 100% of their allocable share of the Fund's unfunded vested benefits. After receiving these notices, each of the plaintiffs asserted that it had sold all of its assets to unrelated parties and, accordingly, that each was entitled to a reduction in its withdrawal liability, to 30% of its liquidation or dissolution value, under ERISA Section 4225(a), 29 U.S.C. § 1405(a).

After much negotiation, all of the plaintiffs eventually settled with the Fund. These settlements were memorialized in a variety of ways such as stipulations, accords and satisfactions, general releases and other types of writings. Both sides agree, however, that for the purposes of these motions these variations are not important and that all of the settlements at issue herein should be treated equally. *See* Defendants' Memorandum in Support of Cross-motion for Summary Judgment at 10, n. 8; Affidavit of Stanley D. Halperin in Support of Plaintiffs' Motion for Summary Judgment at ¶¶ 2–3. These settlements were made at 30% of the liquidation or dissolution value. There is no question that each plaintiff paid the full amount negotiated under the settlements. Plaintiffs claim that they were given to understand by the defendants that payment of these settlements constituted full and complete satisfaction of their respective withdrawal liability obligations, and therefore, in most cases, the assets remaining after the payments were made were distributed to the shareholders of the corporations.

Now the controversy. In 1986, after many of the settlements had been final for some time, the United States Court of Appeals for the Ninth Circuit issued a decision which interpreted sections 4225(a), (b) and (d) for the first time. *Trustees of the Amalgamated Insurance Fund v. Geltman Industries, Inc.*, 784 F.2d 926 (9th Cir.), *cert. denied*, 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986). The *Geltman* decision adopted an interpretation of section 4225(a) which differed substantially from the interpretation previously applied by the Fund and by the plaintiffs in the settlements mentioned above. The question before the Court is whether, notwithstanding the final settlements, the defendants are entitled to seek additional money from the plaintiffs pursuant to the interpretation of withdrawal liability set out in *Geltman*. Plaintiffs, of course, assert that the defendants are barred from undoing the settlements. Defendants claim the settlement agreements are voidable based on the doctrine of mistake of law and that once the settlements are vacated, the *Geltman* interpretation of the Ninth Circuit should be applied retroactively and the withdrawal liability recalculated.

## LEGAL ANALYSIS

In their papers, the parties erroneously assumed that the doctrine of retroactive application, by itself, permits final settlements to be disturbed. As this doctrine relates exclusively to open, pending matters, it need be reached only if the Court decides that the final settlement agreements should be avoided. Because I conclude, for the reasons set forth below, that these agreements should not be avoided, there is no need to address the retroactivity issue.

The defendants' contention that the final settlements are voidable and may be re-opened under the doctrine of mutual mistake of law requires an examination of the law existing at the time the settlements were negotiated as well as the law which purportedly was applied to the settlements so that a determination can be made as to whether the parties were indeed mistaken. When the settlements were negotiated and finalized during the years 1982 through 1985, the parties agreed that section 4225(a) of ERISA controlled. The parties were also well aware that during this time period there were no cases involving the interaction of ERISA sections 4225(a), (b) and (d). *See* Defendants' Memorandum at 7. As section 4225(a) was interpreted by all of the parties and applied to the respective settlements, each of the plaintiffs was regarded as solvent and was entitled to the 30% limitation provided for in the subsection. Under the parties' interpretation, withdrawal liability was measured as a percentage of dissolution value and therefore could not render insolvent an otherwise solvent employer.

The Ninth Circuit's interpretation of the statute is quite different. The *Geltman* Court held that when applying the limitations on withdrawal liability, the solvency of the withdrawing party must be determined under section 4225(d)—without looking first to section 4225(a)—thereby including the total unadjusted withdrawal liability in the liabilities of the employer. 784 F.2d at 929. Only if an employer is solvent under this reading of section 4225(d) does section 4225(a) apply to limit the withdrawal liability to a percentage of the liquidation or dissolution value of the employer. *Id.* If an employer is insolvent under this reading of section 4225(d), then section 4225(b) applies, *id.* at 930, and, accordingly, a withdrawing employer could be required to pay its entire remaining assets as withdrawal liability. Consequently, under *Geltman,* an otherwise solvent employer would lose the benefit of the percentage limitation under section 4225(a). *Id.* at 931. Were the *Geltman* interpretation applied here, the plaintiffs would be considered insolvent and their withdrawal liability, determined under section 4225(b) would be much greater.

Under the law of contracts, a mutual mistake involves a belief of both parties to a contract "that is not in accord with the facts." Restatement (Second) of Contracts § 151 (1981). The mistaken or erroneous belief "must relate to the facts as they exist at the time of the making of the contract." *Id.* Moreover, there is no longer a distinction drawn between a mistake of law or a mistake of fact; "the existing law is part of the state of facts at the time of agreement." E.A. Farnsworth, *Contracts* § 9.2, at 649 (1982). Accordingly, the only "law" about which there may be a mistake can be "the law in existence at the time of the making of the contract...." Restatement (Second) of Contracts § 151, Comment b, at 384; *see also Kinney v. Kinney,* 48 A.D.2d 1002, 1002–03, 369 N.Y.S.2d 258, 260 (4th Dep't 1975) ("Contract obligations are determined by the law in force at the time the contract is executed.")

Here, the law in existence at the time of the settlement agreements was section 4225, albeit without any judicial construction. As stated above, all of the parties knew and understood that this section had not yet been judicially construed when the agreements were negotiated and completed. Therefore, by agreeing that the 30% limitation on withdrawal liability under section 4225(a) was applicable, all of the parties knew that it was possible that a court could construe the statute differently.

The fact that they knew that a court might interpret the statute differently does not mean that the parties intended to allow rescission of the agreement, if as may be the case, one party got a better bargain than anticipated. *Leasco Corp. v. Taussig,* 473 F.2d 777, 781 (2d Cir.1972). None of the cases cited by the defendants in their memoranda stand for the proposition that each time a court rules on a statute, prior conduct and reliance of parties and contracts made in connection with that statute must be upset to conform to the recent interpretation of the statute.

Furthermore, that the parties agreed on a percentage of liability and that, under one court's interpretation this percentage was incorrect does not mean that a mistake was actually made. As stated by the Seventh Circuit Court of Appeals in a similar context, a "settlement itself is an exercise in compromise rather than resolution of legal issues. The parties compromise on legal and factual matters, and there could be a very substantial range within which a compromise would be reasonable. There is no 'right' settlement." *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 831 (7th Cir.1985); *accord McLaughlin v. Jung*, 859 F.2d 1310, 1312 (7th Cir.1988). In addition, it is quite probable, and there is no evidence to the contrary, that the parties were motivated to settle by a mutual desire to avoid both the expense and the risks of litigation or arbitration. There is no question that, had the issue gone to arbitration or litigation in the first instance, there would have been significant risks involved as there had been no definitive construction of the statute. Even after *Geltman*, counsel for the defendants admitted that "the Ninth Circuit could reasonably have reached a different result under the statute, and that a different result could conceivably be reached by other federal courts facing this issue." Affidavit of Norman Solovay, Exhibit 1. Under these circumstances, then, it would be inappropriate to permit the defendants to avoid the settlement agreements.

▪ Even if it could be said that the parties made a mutual mistake, the Fund would still have to establish that it did not bear the risk of the mistake. Restatement (Second) of Contracts § 154. This the Fund cannot do. The agreement itself does not contain a reservation of rights in the event of a different judicial interpretation of the statute. In addition, in light of the uncertainty of the operation of the statute and all of the parties' knowledge thereof, it can be fairly stated that all of the parties bore the risk that a subsequent resolution of the uncertainty by a court might be adverse to the positions taken in the settlement. *See In Re South Central States Bakery Products Antitrust Litiga-*

*tion,* 88 F.R.D. 641, 644 (M.D.La.1980) ("A compromise may be defined as an agreement for settling a dispute between the parties ... on what [they] believe to be equitable terms, having due regard for the uncertainty of the facts or the law, or both, inherent in the dispute ... and involving mutual concessions and/or yielding of opposing claims.").

▪ In addition, allowing the defendants to avoid the settlement agreements because of a new interpretation of the law leads to the undesirable result that parties who enter into settlement agreements in the absence of a judicial decision interpreting an applicable statute do so at their peril and are not entitled to rely on the security of their settlement documents. Settlements which are made in reliance on a judicial decision that is subsequently overruled are not so endangered, *see Lemon v. Kurtzman,* 411 U.S. 192, 207–08, 93 S.Ct. 1463, 1472–73, 36 L.Ed.2d 151 (1973), and this Court declines to place settlements made in the absence of judicial interpretation on different footing.

▪ Finally, to permit the defendants to avoid the settlement agreements would be to seriously undermine the strong public policy favoring out of court settlements. *ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 722 F.2d 988, 997 (2d Cir.1983); *Robertson v. National Basketball Assn.,* 72 F.R.D. 64, 68 (S.D.N.Y.1976), *aff'd,* 556 F.2d 682 (2d Cir.1977); *see also Bass v. Phoenix Seadrill/78, Ltd.,* 749 F.2d 1154, 1164 (5th Cir.1985) (public policy favors voluntary settlements which obviate the need for expensive and time-consuming litigation); *Moses–Ecco Co. v. Roscoe–Ajax Corp.,* 320 F.2d 685, 690 (D.C.Cir.1963) ("a settlement payment, made when the law was uncertain, cannot be successfully attacked on the basis of any subsequent resolution of the uncertainty ... [o]therwise the public policy of encouraging settlements would be seriously undermined").

Accordingly, in light of the equities and the value of preserving the force and effect of final settlements and releases, the defendants are hereby barred from avoiding the

final settlements made with the plaintiffs prior to the issuance of the *Geltman* decision on March 7, 1986. Plaintiffs' motion for summary judgment is granted. Defendants cross-motion for summary judgment is denied, as is defendants' motion for leave to amend their answer to file counterclaims. Should plaintiffs still desire to make an application for costs and attorney's fees pursuant to 29 U.S.C. § 1451(e), they are ordered to submit within 30 days of this opinion supporting papers with appropriate case authority as well as affidavits detailing the nature, hours, and dates of work performed in connection with this matter, the names of the attorneys who worked on the matter, and the hourly rate(s) requested.

SO ORDERED.