IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 10, 2009 Session

## MILLENNIUM TAXI SERVICE, L.L.C. v. CHATTANOOGA METROPOLITAN AIRPORT AUTHORITY

Appeal from the Circuit Court for Hamilton County
No. 05C1445    W. Neil Thomas, III, Judge

No. E2008-00838-COA-R3-CV  - FILED JUNE 30, 2009

Millennium Taxi Service, L.L.C., filed suit against the Chattanooga Metropolitan Airport Authority ("CMAA") seeking a declaration that CMAA regulations prohibiting unregistered taxicabs from picking up passengers curbside at the Chattanooga Metropolitan Airport were unconstitutional. Millennium further sought injunctive relief prohibiting enforcement of the challenged regulations. In its counterclaim, CMAA asserted that Millennium had repeatedly and flagrantly violated its regulations and requested that Millennium be permanently enjoined from engaging in any further violations. The court granted in part and denied in part summary judgment to CMAA upon finding that the challenged regulations had a rational basis and did not discriminate unreasonably against unregistered taxis. Millennium appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and J. STEVEN STAFFORD, J., joined.

William C. Killian, Jasper, Tennessee, for the appellant, Millennium Taxi Service, L.L.C.

Hugh J. Moore, Jr., William R. Hannah, and Thomas Greenholtz, Chattanooga, Tennessee, for the appellee, Chattanooga Metropolitan Airport Authority.

**OPINION**

I.

The underlying facts are undisputed. CMAA is a statutorily established metropolitan airport authority created by the City of Chattanooga to operate the Chattanooga Metropolitan Airport. *See* Tenn. Code Ann. §§ 42-4-101, et seq. As a governmental entity, CMAA is further authorized pursuant to the Tennessee Passenger Transportation Services Act to control and regulate private, passenger-for-hire vehicles providing transportation within its jurisdiction – in this case, at the

airport. *See* Tenn. Code Ann. §§ 7-51-1001 and 1003(b)(1). Millennium is a limited liability corporation that provides taxi service throughout Chattanooga, including to and from the airport. Millennium is licensed to do business by the City of Chattanooga, but has not registered its taxicabs with the CMAA or received permits for them. This is not the first time that these parties have litigated issues related to taxi service at the airport.

Shortly after its inception in 1985, CMAA enacted the first set of rules and regulations governing ground transportation service at the airport. In 2005, Millennium filed its first suit against CMAA, challenging regulations that required all taxicabs operating at the airport to register with CMAA and use only the designated taxicab zone for picking up passengers. Moreover, registered taxicabs were subject to a requirement that they be no more than ten years old. In June 2006, the trial court granted summary judgment to CMAA upon finding, in part, that "taxicabs operating within the taxicab zone are properly subject to regulation by CMAA under its minimum safety standards." In clarifying its ruling, the court further held, "however, that taxicabs choosing not to apply for, and to receive, a CMAA permit allowing use of the zone designated by CMAA for taxicab use are not subject to regulation under the CMAA's generally applicable current rules and regulations, which are subject to appeal, modification, and amendment . . . ." One month later, CMAA amended its regulations – entitled "Commercial Ground Transportation Rules and Regulations" ("the Regulations") – to address access to the entire terminal curbside area, both inside and outside the designated zones for taxicabs and other commercial vehicles. At the center of the present dispute are the following Regulations:

III. General Operating Requirements

B. Operating Fees

The following fee schedule will be applied *to all commercial ground transportation vehicles conducing pick-ups from the curb* at the [airport]:

| | |
|---|---|
| Taxi Cabs | $100.00 per vehicle per quarter |
| Limousines | $100.00 per vehicle per quarter |
| Courtesy Cars/Vans | $100.00 per company per quarter |
| Busses | $200 per vehicle per year |
| Non-registered Vehicles | $50.00 per vehicle per visit |
| Baggage Delivery | $100.00 per vehicle per quarter |
| Overnight Terminal Parking | $6 per vehicle per night |

Delivery vehicles are specifically excluded

G.  Queuing Area

*Any permitted vehicle . . . picking up passengers shall use only the hold area or loading area assigned to them as designated in Appendix 6.[1]  These areas are for the exclusive use of commercial ground transportation vehicles[2] registered with CMAA.  Non-registered taxicabs may pick up incoming passengers, but they may not use any portion of the curb area, but instead must park in one of the CMAA parking lots.*  Drivers of non-registered taxicabs may, after parking their vehicles in one of the CMAA parking lots, . . . enter the terminal area in order to locate their passenger . . . .  Non-registered taxicabs may drop off passengers at any appropriate and not otherwise designated area of the curb.

(Underlining in original; emphasis and footnotes added.)

The restriction against curbside pickups by non-registered taxis is again referenced in the Regulations as follows:

V.  Taxi Cabs

L.  Non-Registered Taxi Pick-Ups

If a taxicab company that is not registered with CMAA is requested to provide transportation, the taxicab driver must park in one of the on-site parking lots.  The cab driver may meet his/her passenger at the bottom of the escalators. . . .

CMAA will not reimburse . . . for parking fees.  No loitering on the curb will be permitted.  Any non-registered vehicle and operator not complying with this policy will be removed from the airport premises, and will be charged the $50 non-registered vehicle fee . . . ."

(Underlining in original.)

In January 2007, Millennium filed suit against CMAA in the instant case.  Millennium alleged that the Regulations, as amended, were an unconstitutional exercise of CMAA's police powers; created discriminatory classifications between non-permitted taxicabs and other commercial

---

[1]Appendix 6 is not included in the record on appeal.

[2]"Commercial vehicles" are defined to include taxicabs, shuttles, buses, vans, limousines, courtesy vehicles, baggage delivery service vehicles, and rental vehicles.

vehicles; were unlawfully enforced against Millennium taxicabs; were unconstitutionally vague; constituted an inducement for Millennium to breach its contracts with its customers; and were enacted in contempt of the trial court's ruling in the first lawsuit. Initially, the trial court dismissed the breach of contract claim, finding that it was barred.[3] Then, an agreed order of dismissal was entered with respect to Millennium's claims that the Regulations created discriminatory classifications by imposing age limits for taxicabs and that these age limit provisions were selectively enforced against Millennium taxis.

In December 2007, CMAA moved for summary judgment on Millennium's remaining claims. In support of its motion, CMAA submitted affidavits of past and present CMAA executives, including its former Airport Security Coordinator, Ruth Dudley. Dudley was primarily responsible for the implementation and enforcement of the "new" Regulations. Dudley said that the Regulations were amended to comprehensively regulate the use of the entire curb area in front of the terminal building in order to address a variety of CMAA's concerns and objectives. These included effectively managing its limited curb frontage; optimizing traffic flow (vehicular and pedestrian); ensuring quality control and customer satisfaction with ground transportation services originating from the airport; and optimizing the image portrayed by the airport and the city to the traveling public. In her affidavit, Dudley stated, in relevant part:

> The Regulations treat different types of commercial ground transportation vehicles differently because of the different characteristics and functions of those various types of . . . vehicles. For example, large buses are directed to park in areas that are accessible to and usable by vehicles of that size rather than in locations where they physically cannot be parked or which would block other vehicles. Similarly, vehicles carrying passenger are generally more regulated and held to higher standards than those carrying only luggage or freight. Finally, vehicles charging passengers a fee for transport are generally more extensively regulated that vehicles providing transportation as a courtesy (such as a shuttled provided by a hotel) to persons who have already selected that provider and who are not paying a separate fee for service.
>
> [T]he Regulations allow those taxicabs bearing CMAA permits to park in a designated area, which is referred to as the "taxicab zone" or collectively as the "taxicab hold spaces." Taxicabs without CMAA permits are not allowed to utilize the taxicab zone. The Regulations do not allow a taxicab without a CMAA permit to conduct a curbside pickup unless the operator of that taxicab pays CMAA a $50.00 per vehicle per visit fee. Taxicabs, regardless of whether they bear CMAA permits, are allowed to drop off passengers curbside, but are not allowed to park curbside. Taxicabs without

---

[3]At the hearing, Millennium conceded that this claim was properly dismissed.

CMAA permits may park in CMAA's public parking lots or in other authorized locations in order to wait for a customer or to make a pickup, and may park for up to fifteen (15) minutes without charge in CMAA's short-term parking lot.

The Regulations prohibit non-permitted taxicabs from parking curbside because CMAA wishes to manage access to and traffic flow along the terminal curb, and to provided departing patrons at the [airport] with immediate, close proximity access to ground transportation options from providers whose identities are know to CMAA and who meet minimum safety, quality, cleanliness, and reliability standards imposed by CMAA.

In his affidavit, Scott Broyles, former CMAA Vice President of Operations, stated that he was responsible for enforcement of the Regulations. He said that airport police officers were knowledgeable about the Regulations and that they properly and uniformly applied them and documented their monitoring and enforcement activities. Broyles said that from the time of their enactment in July 2006 until September 2007, CMAA had documented enforcement of the Regulation prohibiting improper curbside parking on at least 23 separate occasions against taxi or limousine operators other than Millennium and against at least four taxi or limousine companies other than Millennium.

In opposing the motion, Millennium summarized its position as follows:

The crux of the new regulations apply to [Millennium ] in that they prohibit it from picking up new customers at [the] curbside of the [airport]. The Complaint alleges that this is a discriminatory classification, discriminatorily enforced and, for those reasons, exceeds the constitutional and statutory authority granted to the CMAA . . . .

In its March 19, 2008, "Memorandum and Partial Judgment," the trial court promptly disposed of the first two issues – whether the Regulations in general and pertaining to taxicabs operating outside the taxi zone in particular – were within CMAA's authority to enact. In short, the trial court found that the CMAA had full regulatory power over the property within its jurisdiction, including taxi cab regulation. The trial court continued:

[T]he remainder of the pleadings . . . are as follows:

Whether [the Regulations] discriminate against non-permitted taxis because they are not allowed to pick up curbside passengers like buses and vans which pay a quarterly fee rather than a $50.00 visit fee by non-permitted taxis.

-5-

Whether [CMAA] has discriminated in its enforcement of [the Regulations] against Millennium.

\* \* \*

Practically speaking, this Court must determine whether or not the regulations as applied to Millennium were within [CMAA's] authority to manage and utilize the curb frontage at the Terminal Building and traffic flow, as well as the monitoring of customer satisfaction with ground transportation. In assessing that application, the Court is faced with not whether the drop-off of passengers by non-permitted taxi cabs is permissible, because under the regulations that is permitted, but rather the issue becomes whether the pick-up of passengers by non-permitted taxi cabs at curbside is impermissible, given their ability to use the short-term parking spaces [without charge] for a period of fifteen minutes. Concurrent with this inquiry is whether there is an impermissible classification between curbside pick-up between non-permitted taxi cabs and other carriers. Under the record in this case, there can be no doubt but that the regulations have a rational basis. The question becomes whether they further legitimate government interests. Although Millennium complains that a $50.00 per visit fee amounts to a prohibition, the Court is not entirely persuaded that such a prohibition would be impermissible. This conclusion is buttressed by the permission offered by [CMAA] for non-permitted taxi cabs to park in the short-term lot for up to fifteen minutes without charge. Additionally, the distinction made in [the Regulations] between non-permitted taxi cabs and other commercial users, whether they be buses or vans, does not appear to be invidious or discriminate unreasonably against Millennium. That distinction is based upon the service provided and the access needed to curbside. For these reasons, the [Regulations] will be upheld.

**The Issue of Selective Enforcement or Discrimination in Application**

[I]t would appear that Millennium's claims under this theory are threefold: (1) permitting permitted cabs to park outside the zone; (2) imposing different regulations for other commercial vehicles; and (3) prohibiting non-permitted taxis to do all things that private vehicle traffic can do. The Court has already discussed the second issue. With respect to the third issue, [CMAA] had explained the reason for difference in classification between non-permitted taxis and private vehicle traffic. This explanation constitutes a rational basis. Although [CMAA] has submitted evidence to support its contention

that it has not discriminated between permitted and non-permitted taxis parking curbside, there is sufficient evidence in the record to create a genuine issue of material fact with respect to that issue in this case. Accordingly, summary judgment will be granted on the "targeting" issue, except for the allegation of unequal treatment between permitted and non-permitted taxi cabs parking curbside.

(Capitalization and bold print in original).

With the noted exception, the trial court granted summary judgment in favor of CMAA on all claims. Thereafter, Millennium dismissed voluntarily this remaining claim and timely appealed the grant of summary judgment to CMAA.

## II.

We review the propriety of the trial court's grant of summary judgment under the standard set forth in Rule 56.04, Tenn.R.Civ.P., which provides that summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. ***Town of Huntsville v. Duncan***, 15 S.W.3d 468, 471 (Tenn. Ct. App. 1999). In the present case, the material facts necessary to our determination are undisputed. As a result, our review involves only a question of law and no presumption of correctness attaches to the trial court's findings. ***Id***. (citing ***Gonzales v. Alman Constr. Co.***, 857 S.W.2d 42, 44 (Tenn. Ct. App. 1993)).

## III.

Taken verbatim from its brief, Millenium raises the following issue on appeal:

Does the [CMAA] regulation prohibiting curbside pickup by taxicabs, not registered with CMAA, constitute an unconstitutional discriminatory exercise of its police power?

## IV.

On appeal, Millennium does not dispute the authority of CMAA to regulate transportation services at the airport. Rather, Millennium contends that the Regulations violate equal protection principles by prohibiting only non-registered taxis from conducting curbside passenger pickups. *See* U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8 and art. XI, § 8. Millennium concludes that "[the Regulations], as applied to unregistered taxicabs, create a discriminatory classification without a rational basis for its legitimate government purpose . . . ."

The Tennessee Supreme Court has stated that Article 1, § 8 and Article XI, § 8 of the Tennessee Constitution confer "essentially the same protection" as the equal protection clause of the United States Constitution. ***Tennessee Small School Systems v. McWherter***, 851 S.W.2d 139, 152

(Tenn. 1993). The United States Supreme Court has described the burden undertaken by one challenging the constitutionality of economic legislation as a violation of due process:

> It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S. Ct. 2709 (1984). The same, relaxed "rational basis" test is applied to equal protection challenges to economic legislation. *Harrison v. Schrader*, 569 S.W.2d 825 (Tenn. 1978). The "rational basis test" has been described by the Tennessee Supreme Court as follows:

> The concept of equal protection espoused by the federal and our state constitutions guarantees that "all persons similarly circumstanced shall be treated alike." Conversely, things which are different in fact or opinion are not required by either constitution to be treated the same. "The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States," and legislatures are given considerable latitude in determining what groups are different and what groups are the same. In most instances the judicial inquiry into the legislative choice is limited to whether the classifications have a reasonable relationship to a legitimate state interest.

*State v. Tester*, 879 S.W.2d 823, 828 (Tenn. 1994)(quoting *Tennessee Small School Systems v. McWherter*, 851 S.W.2d at 153)(internal citations omitted)).

It follows that the "keystone in determining the constitutionality of a statute under . . . the [Tennessee] Constitution is reasonableness of classification." *City of Chattanooga v. Harris*, 223 Tenn. 51, 56-57, 442 S.W.2d 602, 604 (1969). "Under this standard, if some reasonable basis can be found for the classification, or if any state of facts may reasonably be conceived to justify it, the classification will be upheld." *Harrison*, 569 S.W.2d at 825. It has been long held that "[r]easonableness depends upon the facts of the case and no general rule can be formulated for its determination." *Id.* at 825-26 (citing *Estrin v. Moss*, 221 Tenn. 657, 430 S.W.2d 345 (1968); *Motlow v. State*, 125 Tenn. 547, 145 S.W. 177 (1912)).

Applying this standard to the Regulations, we must decide whether any reasonable basis supports CMAA's decision to prohibit non-registered taxis from picking up passengers at any portion of the curbside in front of the terminal building. In determining whether a challenge to classification is rationally related to achievement of a legitimate state purpose two questions must be answered: One, does the challenged legislation have a legitimate purpose and two, was it reasonable for the law makers to believe that use of the challenged classification would promote that purpose. *Western & Southern Life Insurance Company v. State Board of Equalization of*

*California*, 451 U.S 648, 668, 101 S. Ct. 2070 (1981).  With respect to the first question, it cannot be convincingly argued that CMAA's cited objectives – controlling access to the limited curbside, effectively managing the flow of vehicles and pedestrians in the area, ensuring quality control and customer satisfaction with ground transportation services originating from the airport, and presenting a favorable image of the airport – are not legitimate legislative purposes.  Millennium's focus, and ours, is on whether CMAA reasonably applied the Regulations to non-registered taxis to further these purposes.

As noted, Millennium's contention is that the Regulations are constitutionally infirm because they prohibit *only* non-permitted taxis from making curbside pickups, thereby creating an arbitrary, discriminatory classification that is not reasonably related to the purposes of the Regulations. Millennium repeatedly asserts, for example, that "passengers could be picked up curbside by private vehicles, buses, and other commercial vehicles, registered taxicabs, etc.," and that the "[Regulations] allow other commercial vehicles to operate curbside, with impunity, and without regulation. . . ." This is simply not true.

Taking registered taxis versus unregistered taxis first, the Regulations authorize registered taxis to park, wait, and pick up their next fare in a designated taxi zone at the curbside outside the baggage claim area.  Under the Regulations, permitted taxis  are subject to age and inspection requirements, among others,  to ensure that they are reliable and in good condition.  Drivers of permitted taxis are subject to a code of conduct governing their appearance and behavior while providing services at the airport.  Companies operating permitted vehicles are subject to fines and other disciplinary action for violating any applicable Regulations.  Taxis not registered with CMAA, on the other hand, are not subject to such regulations and requirements and, as a consequence, are effectively removed from access to incoming passengers unless the passengers has made advance reservations to be picked up by such a vehicle.  With regard to other commercial vehicles, they too are directed to pick up passengers in designated areas curbside or in parking lots depending on the type of vehicle or service provided and whether they are CMAA-permitted.  For example, the Regulations expressly governing passenger pick-ups by non-registered limousines and sedans contain the identical provision applied to Millennium's non-registered taxis.[4]  The Regulations provide, in relevant part:

> VI.  Limousine and Sedan Service
>
> H.  Non-Registered Limousine and Sedan Pick-Ups
>
> If a limousine or sedan company that is not registered with CMAA is requested to provide transportation, the driver of the non-registered vehicle must park in one of the on-site parking lots.  The driver may meet his passenger at the bottom of the escalators . . . .

---

[4]In addition to non-registered taxicabs, limousines and sedans, baggage delivery vehicles not registered with CMAA are also prohibited from making curbside pick ups albeit of packages rather than passengers.

> No loitering on the curb will be permitted. Any non-registered vehicle and operator not complying with this policy will be removed from the airport premises, and . . . charged the $50 non-registered vehicle fee as set forth in section III.

(Underlining in original.)

In our view, the Regulations are reasonably related to their legitimate purpose of presenting incoming passengers with transportation options, whether they be taxis, limousines, or other vehicles, from providers that are known to CMAA to have vehicles that are relatively new, clean, and in good repair – conditions imposed upon all permitted commercial ground transportation vehicles. Although Millennium counters that this objective is not accomplished because its taxis are still allowed to pick up passengers elsewhere at the airport, we are unpersuaded that the Regulations are therefore rendered arbitrary or otherwise unreasonable. Stated another way, we conclude that it is entirely rational for CMAA to restrict the curbside access of incoming passengers to those commercial vehicles that are subject to the requirements governing permitted vehicles in an effort to meet its stated objectives. As noted by Ms. Dudley, CMAA's goal is to present incoming passengers as a first option with permitted vehicles with which CMAA has some level of knowledge both as to the vehicles and their drivers. Those operators, such as Millennium, who choose not to subject themselves to the same requirements as other transportation providers, are not prohibited from operating at the airport, but are unlikely to be the first choice for incoming passengers.[5]

As we read the Regulations, CMAA has not sought to achieve its objectives by disallowing curbside pickups by only non-registered *taxis*. Other non-registered vehicles including limousines and sedans must also park in the airport parking lots to pick up a passenger or pay the $50 "non-registered vehicle" fee to do so. In this manner, CMAA has taken steps to ensure that incoming passengers who have not made arrangements in advance will be presented as a first option with registered and therefore, regulated, transportation providers whether they be taxicabs, limousines, buses, etc. "The fundamental rule is that all classifications must be based upon substantial distinctions which make one class really different from another; and the characteristics which form the basis of the classification must be germane to the purpose of the law. . . ." *State v. Nashville, C. & S. L. R. Co.*, 135 S.W. 773, 776 (Tenn. 1910)(quoting Lewis, 1 Sutherland on Statutory Construction, 366 (2d ed.)). On this record, we conclude that Millennium has failed to demonstrate that CMAA's decision to prohibit curbside pickups by unregistered taxis and other commercial vehicles who choose not to subject themselves to the requirements applicable to permitted vehicles and their drivers, bears no rational relationship to one of its legitimate governmental objectives – providing quality ground transportation services to incoming travelers.

Having concluded that Millennium has not established that the Regulations are unrelated to at least one legitimate purpose, we need not consider whether they are reasonably related to all of

---

[5]At the summary judgment hearing, counsel for CMAA observed that of all the commercial ground transportation operators at the airport, only Millenium and another taxi company, East Ridge, were not registered with CMAA.

the other legislative purposes intended by CMAA. Suffice it to say, however, that CMAA's objectives of controlling access to the limited curbside and regulating the flow of traffic outside the terminal are reasonably met by simply limiting the number of vehicles in the area. Again, that CMAA chose to give preference to permitted ground transportation vehicles to effectuate its objectives does not make the Regulations unconstitutionally discriminatory. A classification having some reasonable basis "is not unconstitutional merely because it results in some inequality." *Harrison*, 569 S.W.2d at 825.

Our de novo review persuades us that the trial court was imminently correct that "there can be no doubt but that the [R]egulations have a rational basis," do not unreasonably apply, and are properly upheld in furtherance of their legitimate government purposes. Accordingly, the trial court correctly granted summary judgment to CMAA.

V.

The judgment of the trial court is affirmed. This case is remanded to the trial court for enforcement of its judgment and for collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed against the appellant, Millennium Taxi Service, L.L.C.

_____
CHARLES D. SUSANO, JR., JUDGE