**Michael A. COSTANTINO,
et al., Plaintiffs,**

v.

**TRW, INC., et al., Defendants.**

**No. C86–3368.**

United States District Court,
N.D. Ohio, E.D.

July 23, 1991.

Leonard F. Carr, Carr, Feneli & Carbone, Lyndhurst, Ohio, Judith A. Lehnowsky, Rocky River, Ohio, Robert D. Gary, Lorain, Ohio, for plaintiffs.

John David, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

This is a class action brought by a group of retirees from TRW, Inc. against TRW and Jake Schoepler, Secretary of the Board of Administrators of TRW's Salaried Em-

ployees Pension Plan ("the plan") (defendants collectively referred to as "TRW"). The plaintiffs are a certified class composed of former employees of TRW who retired between January 1, 1985 and October 22, 1986, and elected to receive their retirement benefits in the form of a lump sum distribution rather than a life annuity. The retirees allege that TRW unlawfully miscalculated the amount of their lump sum distributions, resulting in lower payments being made to them. They allege claims under the Employment Retirement Income Security Act ("ERISA") and the Racketeering–Influenced and Corrupt Organizations Act, ("RICO"), and also allege common law claims based on misrepresentation and unjust enrichment. Both parties have moved for summary judgment as to all of the claims. For the reasons stated, TRW's motion is granted in part and denied in part, and the retirees' motion is granted in part and denied in part. TRW is ordered to amend its plan and re-calculate the lump sum distributions to the retirees to include the early retirement subsidy in the valuation and to use an interest rate that is 120% of the rate set by Pension Benefit Guaranty Corporation (PBGC) at the time the benefits were distributed. If the re-calculation results in increased benefits, then TRW is ordered to distribute the cumulative underpayment to each applicable retiree with interest.

## I.

The TRW Salaried Employees Pension Plan ("the plan"), is a defined benefit, single employer, qualified plan, subject to the vesting, funding, and participation requirements of the Internal Revenue Code and ERISA. Eligible participants of the plan are entitled to receive pension benefits which are normally paid in the form of monthly benefits for life (*i.e.* a life annuity). However, if a participant retires from TRW between the ages of 60 and 70, that participant may elect to receive the present value of his or her pension benefit immediately in one lump sum distribution. Under Section 5.9(b) of the plan, in effect before

December, 1986, this lump sum distribution was determined by the following formula:

> The lump sum benefit shall be the present value of the monthly single life annuity to which the participant would have been entitled except for the election of the lump sum form of payment. In calculating such present value, the interest rate used shall be the average of yields for Moody's Aaa Corporate Bonds for the first month of the calendar quarter ...

The lump sum payment is designed to be equal to the amount of cash needed today to purchase a monthly annuity for life. Thus, the plan's interest rate was designed to match market conditions, and thereby yield a lump sum distribution sufficient to purchase a single life annuity on the market.

In 1984, Congress passed the Retirement Equity Act ("REA") to provide, in part, that lump-sum distributions from qualified plans be calculated using an interest rate no greater than the immediate interest rate set by the Pension Benefit Guaranty Corporation ("the PBGC rate"). *See* Pub.L. No. 98–397, 98 Stat. 1426 (1984). This provision amended 29 U.S.C. § 1053(e)(3) (West 1985) [ERISA] and 26 U.S.C. § 411(a)(11) (West 1985) [Internal Revenue Code] (same section), and went into effect on January 1, 1985.

On July 19, 1985, the Treasury Department issued temporary regulations requiring administrators of qualified pension plans to use the PBGC rate in calculating the amount of the lump sum distributions. *See* Temp. and Prop.Treas.Reg. § 1.417(e)–1T, 50 Fed.Reg. 29,371, 29,436 (1985). The temporary regulation itself states that it is intended only to provide guidance until the issuance of final regulations.

Despite the passage of the REA and the issuance of the temporary treasury regulation, TRW continued to use the interest rate provided for in the plan ("Moody's rate") to calculate the lump sum distributions for employees who retired after January 1, 1985. This rate was higher than the

PBGC rates.[1] Because a higher interest rate yields a smaller lump sum distribution, the retirees received a lower lump sum distribution than if TRW had used the lower PBGC rates.

On October 22, 1986, Congress passed the Tax Reform Act of 1986 ("TRA") and set a new cap on the permissible interest rate used in calculating lump sum distributions. *See* Pub.L. 99–514 § 1139, 100 Stat. 2085, 2487 (1986), 29 U.S.C. 1053(e)(3) (West Supp.1991) and 26 U.S.C. § 411(a)(11) (West Supp.1991). Section 1139 of the TRA provides for application of an interest rate no greater than the PBGC rate if the benefit does not exceed $25,000, and no greater than *120%* of the PBGC rate if the benefit exceeds $25,000. Congress made § 1139 retroactive to distributions that were made after December 31, 1984, even if the distributions were not made in accordance with the Retirement Equity Act of 1984. Section 1139 was not made retroactive to distributions that were made in accordance with the REA. TRW actively lobbied for this amendment and its retroactive application.

Section 1140 of the TRA required employers to amend their pension plans in order to comply with § 1139 for retroactive effect. In December, 1986, TRW amended its plan, recalculated the retirees' lump sum distributions, and, where applicable, sent them supplemental benefits. Only 25% of the retirees received these supplemental benefits. This was because in recalculating the retirees' lump sum distributions, TRW did not include the value of the early retirement subsidy that participants normally had been provided, if they elected to receive monthly benefits.

Under the plan, the normal retirement age is 65. However, an eligible participant may retire as early as age 55, and have his accrued benefits distributed to him over a longer period of time. Under most pension plans, this extended distribution would result in the participant receiving lower monthly amounts.[2] However, to preserve the option of early retirement, TRW subsidized its early retirement benefits. Under the plan, TRW provided employees who retired at age 62 with the same amount of benefits per month as the employee would receive if he waited to retire at age 65. Similarly, TRW provided employees who retired at 55 with a higher amount of benefits per month than he would ordinarily be entitled to without the subsidization.

Before the 1986 amendments, employees who decided to retire early and receive a lump sum distribution, would have received the present value of the monthly single annuity that included the early retirement subsidy. Thus, whether the participant elected to receive a lump sum distribution or monthly payments, he or she would essentially be receiving the same amount. However, in their 1986 amendments, TRW eliminated the early retirement subsidy from the lump sum distributions. In performing their re-calculation, then, TRW applied the § 1139 interest rates to the normal or unsubsidized benefit only.

Under this system, however, many of the retirees who retired early were actually entitled to a *lower* lump sum distribution than the one they already received under the old plan. To avoid any decrease in benefits, TRW amended its plan again in 1988 to provide employees who retired in 1985 or 1986 with the greater of the amount received under the old plan (*i.e.*, where Moody's rate was applied to the subsidized early retirement benefit) or the amount received under the amended plan (*i.e.*, where the § 1139 rate was applied to unsubsidized early retirement benefit). The 1988 amendments also allowed the PBGC rate to be applied to the subsidized early retirement benefit if the lump sum amount was no more than $25,000.

In February, 1987 the Internal Revenue Service issued Notice 87–20, 6 I.R.B. 17 (1987), to provide guidelines for correcting

---

**1.** The PBGC rate was 9.75 in 1985 and 8.75 in 1986, while Moody's rate for 1985 and 1986 was 12.08 and 10.05, respectively. *See* 29 C.F.R. § 2619.65; *Moody's Bond Record,* Vol. 56, No. 1 (Jan. 1989).

**2.** The monthly payment is lower because the same amount of accrued benefits must be spread out over a longer period of time.

lump sum distributions made to employees who retired between January 1, 1985 and January 1, 1987. This notice required that any increases in benefits due to the recalculations using the appropriate interest rate be sent to the employees with interest. On September 2, 1987, TRW sent out an additional interest payment to applicable retirees.

From January 1, 1985 until October 22, 1986, approximately 1,000 salaried employees of TRW retired and elected to receive their pension benefits in one lump-sum distribution. These retirees are all members of the certified plaintiff class that is prosecuting this action. They allege that TRW violated the provisions of the REA when it used the higher Moody's rate instead of the PBGC rate to calculate their lump sum distributions. They also allege that TRW violated the law when it excluded from its recalculations the subsidized portion of their early retirement benefit. The retirees charge that TRW intentionally and fraudulently violated the law in order to further its scheme of depriving the retirees of additional benefits. They bring three claims against TRW for violations of ERISA,[3] two claims for violations of RICO[4], and two claims under state law for misrepresentation and unjust enrichment.

## II.

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law ...

The nature of materials properly presented in a summary judgment pleading is set forth in Federal Rule of Civil Procedure 56(e):

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein ... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Assn., Inc.*, 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is

---

**3.** The retirees allege that TRW violated the following sections of ERISA: 29 U.S.C. § 1053(e)(3) (requiring use of certain interest rates in calculating lump sum distributions); 29 U.S.C. § 1103(c) (requiring that a plan's assets never inure to the benefit of the employer); and 29 U.S.C. § 1104 (requiring the fiduciary of a plan to discharge his duties solely in the interests of the beneficiaries).

**4.** The retirees allege that TRW was engaged in a pattern of racketeering activity in violation of RICO, 18 U.S.C. §§ 1962(a) and (c).

"genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. at 2512.

## III. ERISA CLAIMS

■ The retirees' first count flows from the central issue of this case—namely, whether TRW violated the express requirements of the law in calculating their lump sum distributions. The retirees' claim centers primarily on TRW's failure to use the PBGC rate as required by the Retirement Equity Act of 1984 in its initial calculations. However, the passage of § 1139 of the TRA of 1986 superseded the REA's provisions. Section 1139 expressly provides for the retroactive application of its provisions during the period in question. Therefore, the provisions of the REA are no longer applicable. Only § 1139 of the TRA, 29 U.S.C. § 1053(e)(3) and 26 U.S.C. § 411(a)(11), govern the interest rate that must be used in determining the amount of lump sum distributions of pension benefits.

### A. *The constitutionality of § 1139's retroactivity*

■ The retirees argue that the retroactive application of § 1139 is unconstitutional because it deprived them of a vested property right without due process of law and denied them equal protection of the laws.[5] Both constitutional challenges are based on the due process clause of the fifth amendment.

In challenging the constitutionality of economic legislation as a violation of due process or equal protection, the retirees' must overcome a very heavy burden. As the Court in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, noted:

"It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to this Court with a presumption of constitutionality, and that the burden is on one complaining of due process violation to establish that the legislature has acted in an arbitrary and irrational way."

467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1985) (citing *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976).[6]

In *Gray*, the Court dealt explicitly with a fifth amendment due process challenge to the retroactive application of an ERISA amendment. In upholding the retroactivity provision, the Court rejected the respondent's argument that retroactive provisions should be subjected to heightened judicial scrutiny. The Court noted:

[T]he strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively. Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by a rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches. ...

"[O]ur cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets unsettled expectations."

467 U.S. at 729, 104 S.Ct. at 2717–2718 (quoting *Usery*, 428 U.S. at 15–16, 96 S.Ct. at 2892–2893). The Court went on to hold, "the enactment of retroactive statutes 'confined to short periods required by the practicality of producing national legislation ... is a customary legislative practice.' We

---

**5.** The retirees' equal protection challenge is based on the fact that § 1139 is not retroactive for retirees who from 1984 to 1986 received lump sum distributions benefits that were calculated in conformance with the REA and the temporary regulations that required employers to use the PBGC rate.

**6.** The Court has used the same lenient rational-basis standard in both due process and equal protection challenges to social and economic legislation. *See United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 177, 101 S.Ct. 453, 460, 66 L.Ed.2d 368 (1980) (denied equal protection challenge to legislation phasing out retirement benefits to certain employees, but not others, because Congress did not act in a "patently arbitrary or irrational way").

are loathe to reject such a common practice when conducting the limited judicial review accorded economic legislation under the Fifth Amendment's Due Process Clause." *Id.* 467 U.S. at 731, 104 S.Ct. at 2718. (quoting *United States v. Darusmont,* 449 U.S. 292, 296–297, 101 S.Ct. 549, 551–552, 66 L.Ed.2d 513 (1981) (*per curiam* )).

Under this limited standard of review, then, there is no rational basis for holding that § 1139's retroactivity provision unconstitutional. In its committee report, the U.S. Senate Finance Committee explained that § 1139 was passed because of concern that:

> the present-law cash out rules encourage plan participants to request a cash out of benefits in order to receive a favorable interest rate assumption on the cash out. The interest rates required to be provided under present law may lead employers to make plan distributions unavailable until normal retirement age because of an employer's concern about the solvency of the plans assets when all terminating employees request lump sum distributions.

*See* S.Rep. No. 313, 99th Cong.2d Sess. 642 (1986). As the Court held in *Gray,* it is "eminently rational" for Congress to conclude that the purposes of § 1139 can be more fully effectuated if given retroactive application. *See Gray,* 467 U.S. at 730, 104 S.Ct. at 2718. First, retroactive application protects to the fullest extent possible pension plan assets and allows for the continued availability of benefits at an early retirement age. Second, retroactivity ensures to the fullest extent possible that participants who elected lump sum distributions and participants who elected monthly benefits will be treated equally. It is also rational for Congress to distinguish between the retirees and others who received lump sums based on the PBGC rate in light of the practical difficulties of allowing employers to seek refunds of these benefits. Accordingly, this Court concludes that the retroactive provision of § 1139 of the Tax Reform Act of 1986 withstands any consti-tutional attack based on due process or equal protection grounds.

**B.** *The legality of TRW's recalculations*

The only remaining issue, then, is whether TRW complied with § 1139 when it recalculated the retirees' lump sum distributions. The retirees' charge that TRW violated § 1139 and IRS Notice 87–20 by (1) excluding from the recalculation the present value of the subsidized portion of the early retirement benefit; (2) applying the PBGC rate set at the beginning of the year, rather than the rate that existed at the time of distribution; and (3) failing to include along with the payment of supplemental benefits, a payment of interest.

### 1. Exclusion of the Early Retirement Subsidy

■ TRW argues that nothing in § 1139 or the treasury regulations that interpret it required them to apply § 1139 rates to the early retirement subsidy. It points to Treas.Reg. § 1.411(a)–11(2) (1988) which clearly states that such a plan is lawful:

> [I]f a plan that provides a subsidized early retirement annuity benefit specifies that the single sum distribution benefit available at early retirement age is the present value of the normal retirement annuity benefit, then the normal retirement annuity benefit is used to apply the valuation requirements of this section and the resulting amount of the single sum distribution available at early retirement age.

While it may be legal to *establish* such a plan, there is some question whether TRW can legally *amend* a plan to establish this system.

The retirees assert that when TRW amended its plan to eliminate the early retirement subsidy from the re-calculation of the retirees' lump sum distributions, it violated ERISA § 204(g)(2), 29 U.S.C. § 1054(g)(2) [26 U.S.C. § 411(d)(6) (same section) ] (West Supp.1991). This section prohibits employers from amending their plans to eliminate or decrease early retirement benefits or retirement-type subsidies.[7]

---

**7.** 29 U.S.C. § 1054(g) and 26 U.S.C. § 411(d)(6) provide, in their most relevant parts:

The treasury regulations designed to interpret this section refer to early retirement benefits and retirement-type subsidies described in 26 U.S.C. § 411(d)(6) as "protected benefits." *See* Treas.Reg. § 1.411(d)(6) (1988).

Before 1984, § 1054(g) only protected "accrued benefits" from being decreased or eliminated by amendments. ERISA defines an "accrued benefit" as a participant's right to a retirement benefit "determined under the plan ... expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002 (West Supp.1991). If the benefits are commenced at an earlier age or given out in a different form, such as a lump sum distribution, then the "accrued benefit" is the portion of the benefits that represent the "actuarial equivalent" of an amount that would normally have been received. *See* 29 U.S.C. § 1054(c)(4); *Amato v. Western Union International, Inc.*, 773 F.2d 1402 (2d Cir.1985), *cert. denied*, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1985).[8] Thus, the "accrued benefit" can best be defined as the actuarial equivalent of the annual benefit commencing at normal retirement age.

Any benefits that the plan provides above and beyond the "accrued benefit" is a subsidy. TRW's early retirement subsidy, then, is not an "accrued benefit" as defined by ERISA. *See McBarron v. S & T Industries, Inc.*, 771 F.2d 94 (6th Cir. 1985); *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 917–18 (3rd Cir.1990); *Tilley v. Mead Corporation*, 927 F.2d 756, 759 (4th Cir.1991); *Adams v. LTV Steel Mining Co.*, 936 F.2d 368 (8th Cir.1991); *American Stores Co. v. American Stores Co. Retirement Plan*, 928 F.2d 986, 990 (10th Cir. 1991); *Serb v. Gagnier Products Company Pension Plan & Trust*, 658 F.Supp. 6, 7–8 (E.D.Mich.1985).

In the Retirement Equity Act of 1984 (REA), Congress amended this section to include early retirement benefits and retirement-type subsidies within § 204(g)'s protection. Early retirement subsidies are still not "accrued benefits", but for purposes of this section only, they are to be treated as "accrued benefits", and thus protected from plan amendments that eliminate or decrease them. By providing early retirees with the increased benefits that automatically result from having an early retirement subsidy included in the valuation of their lump sum distributions, TRW provided these early retirees with a "protected benefit" that cannot be decreased or eliminated by plan amendment without violating § 204(g)(2).

Several courts have held that companies are free to amend their plans to eliminate or decrease early retirement benefits. However, these cases can be distinguished. In *American Stores Co.*, the Tenth Circuit held, "[O]ur analysis of the relevant ERISA provisions leads us to conclude that to the extent the early retirement benefits actuarially exceed the normal retirement benefits, the excess is not an accrued benefit and may, therefore, be reduced by the plan sponsor without violating ERISA." 928 F.2d at 990. However, the court explicitly stated that it was applying § 204(g) before its 1984 amendments. In *Berger*, 911 F.2d at 918, the Third Circuit held that since an early retirement benefit "is not an accrued benefit", then "the denial of this benefit cannot violate § 204(g) (29 U.S.C.

---

**(g) Decrease of accrued benefits through amendment of the plan.**

(1) The accrued benefit of a participant may not be decreased by an amendment of the plan

(2) For purposes of paragraph (1), a plan amendment which has the effect of—

(A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in the regulations), or

(B) eliminating an optional form of benefit, with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies the pre-amendment conditions for the subsidy.

**8.** 29 U.S.C. § 1054(c)(3) provides:

in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age ... the employee's accrued benefit ... shall be the actuarial equivalent of such benefit amount.

§ 1054(g)). However, this court reached its holding because the plaintiffs in that case did not satisfy the pre-amendment conditions for the benefits.

In fact, several courts that have applied § 204's pre-amendment provisions explicitly recognized that the 1984 REA amendments would have changed their result. For example, in *Bencivenga v. Western Pennsylvania Teamsters and Employers Pension Fund,* 763 F.2d 574 (3rd Cir.1985), the court held that a fund could properly reduce the amount of early retirement benefits to an amount equal to the actuarial equivalent of normal retirement benefits without violating § 204(g) (i.e. the same action taken by TRW). However, the court also expressly noted, "Congress has now amended the ERISA statute in a manner that will have a significant bearing on future claims of this kind." *Id.* at 575. Also, in *Serb,* the court noted that "[w]hile Congress has amended 29 U.S.C. § 1054(g) to include early retirement benefits within its accrued benefits protection, this amendment does not apply to plan years before January 1, 1985." 658 F.Supp. at 8.

Section 1139 itself and the final treasury regulations interpreting it discuss how TRA § 1139 and ERISA § 204(g) [IRC § 411(d)(6)] interact. Treas.Reg. § 1.417(e)–1(d) states, "A plan amendment that changes the rate (for valuing a lump sum distribution) is subject to section 411(d)(6)." § 1139(d)(2) of the TRA, however, provides a special exception to § 411(d)(6):

(2) Reduction in Accrued Benefits—

(A) In General—If a plan—

(i) adopts a plan amendment before the close of the first plan year beginning on or before January 1, 1989, which provides for calculation of the present value of the accrued benefits in the manner provided by the amendments made by this section, and

(ii) the plan reduces the accrued benefits for any plan year to which such a plan amendment applies in accordance with such plan amendment, such reduction shall not be treated as a violation of section 411(d)(6) of the Internal

Revenue Code or section 204(g) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1054(g)).

IRS Notice 87–20 states that "this limited exception from the requirements of section 411(d)(6) of the Code applies only if the amendment to replace the plan language providing for the 'PBGC immediate interest rate' with plan language providing for either the 'applicable interest rate' or the 'section 1139 limits' ..." In other words, the exception only applies to companies who amended their plans after the 1984 REA amendments to comply with its provisions, and then amended their plans again after the 1986 TRA amendments. TRW failed to comply with the 1984 interest rate limits, so this exception does not apply to it.

TRW's main argument is that the amendment never actually "decreased" the retirees' benefits. It argues that since the plan only promised the retirees a lump sum distribution based on Moody's rate, the retirees received what they were promised, no less. Indeed, the treasury regulations issued under IRC § 411(d)(6) provide that "early retirement benefits, retirement-type subsidies, and optional forms of benefits are section 411(d)(6) protected benefits only if they are provided under the terms of the plan." Treas.Reg. § 1.411(d)(4). These regulations, however, further explain:

A plan may not be amended to eliminate or reduce a section 411(d)(6) protected benefit that has already accrued ... However, a plan may be amended to eliminate or reduce section 411(d)(6) protected benefits with respect to benefits not yet accrued as of the later of the amendment's adoption date or effective date without violating section 411(d)(6).

TRW's plan amendments were adopted in December, 1986 to be made effective January 1, 1985. As of the later date, December, 1986, the retirees had accrued the right to receive a lump sum distribution that was the present value of the single monthly annuity that included the early retirement subsidy. The interest rate only provides the formula for calculating the value of these benefits. By passing § 1139, Congress only required TRW to

change the formula for valuing benefits already provided for by the plan. It did not authorize plan amendments in violation of 29 U.S.C. § 504(g) that eliminate benefits previously included in this valuation.

In fact, by amending its plan to eliminate the early retirement subsidy from the re-calculation, TRW actually circumvented the intended effect of Congress in passing the REA and TRA amendments. The TRA and REA amendments were intended to place a cap on the interest rate used to value lump sum distributions. The end result of this cap was to provide retirees who received lump sum distributions a higher amount of lump sum benefits than were provided under the interest rates used by existing plans. In other words, Congress intended that this interest rate cap would result in retirees receiving higher, not lower, benefits.[9] Internal Revenue Service Notice 87–20 contemplated that companies, after re-calculating lump sum distributions using the lower interest rates, would have to pay retirees "increases" resulting from "cumulative underpayments." The notice did not contemplate or authorize companies altogether eliminating benefits from the calculation, and thus eliminating any increase that should have resulted from the re-calculation. TRW characterizes the retirees' claims for increased benefits as a "windfall." However, this "windfall" resulted from the express intention of Congress. Moreover, it is a "windfall" that retirees from other companies have enjoyed. By effectively depriving the retirees of this expected effect, TRW completely circumvented and eliminated the intended result of § 1139.

2. The time for determining interest rate

█ The retirees claim that TRW improperly used the PBGC rate in effect at the beginning of a plan year instead of the PBGC rate at the time of each distribution. The final treasury regulations interpreting § 1139 specifically permit a plan to choose between using the PBGC rate at the beginning of the year and the rate at the time of

distribution. *See* Treas.Reg. § 1.417(e)–1(d)(3). The regulations further state, however, that "the Commissioner may in revenue rulings, notices or other documents of general applicability prescribe other times for determining the section 417 interest rate limitations."

The Commissioner made such a prescription in IRS Notice 87–20 which states:

> For purposes of recalculating the amount of the benefit, if the date the benefits commenced precedes the first day of the first plan year beginning after December 31, 1986, the date for the determination of the "applicable interest rate" (and 120% of that rate, as appropriate) shall be the date the benefits commenced.

The retirees all received their benefits before December 31, 1986. Accordingly, then, TRW should have used the rate set by the PBGC on the date the benefits commenced.

### 3. Interest Payments

TRW sent out supplemental benefits to the retirees who were entitled to receive them under its re-calculations before IRS Notice 87–20 was issued requiring that interest payments be sent out as well. Accordingly, TRW sent out payments of interest to those retirees who received increased benefits under their recalculations. If the retirees are entitled to more benefits, as a result of this judgment, then they shall also be entitled to interest on those underpayments.

### C. *Exhaustion of Administrative Remedies*

█ In *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 986 (6th Cir.1991), the Sixth Circuit held that "[t]he administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit in federal court." *Makar v. Health Care Corp. of Mid-Atlantic,* 872 F.2d 80 (4th Cir.1989), is to the same effect. The *Makar* court explained that although ERISA does not explicitly

---

**9.** Even in the case where the interest rate would result in lower benefits (because the plan used a lower interest rate than 120% of the PBGC rate),

the treasury regulations authorize that "the rate producing the greatest benefit shall be used." Treas.Reg. § 1.417(e)–1(d)(4)(i).

require exhaustion, ERISA does require benefit plans to provide internal dispute resolution procedures—and

"Congress' apparent intent in mandating these internal claims procedures was to minimize the number of frivolous ERISA lawsuits; promote the consistent treatment of benefit claims; provide a nonadversarial dispute resolution process; and decrease the cost and time of claims settlement. It would be 'anomalous' if the same reasons which led Congress to require plans to provide remedies for ERISA claimants did not lead courts to see that those remedies are regularly utilized." *Id.* at 83 (citations omitted).

The Court also noted that the exhaustion requirement enables plan fiduciaries to "efficiently manage their funds; correct their errors; interpret plan provisions; and assemble a factual record which will assist a court in reviewing the fiduciaries' actions." *Id.*

In *Springer v. Wal–Mart Assoc. Group Health Plan,* 908 F.2d 897, 899 (11th Cir. 1990), the Court of Appeals for the Eleventh Circuit discussed the exceptions to the exhaustion requirement that included the futility of the administrative process and the inadequacy of the administrative remedy. Given the existence of these exceptions to the exhaustion requirement, the court concluded that the "decision whether to apply the exhaustion requirement is committed to the district court's sound discretion and can be overturned on appeal only if the district court has clearly abused its discretion." *Id.* at 899 (citations omitted).

The TRW pension plan contains the following administrative procedure:

*9.7 Claims Procedure*

The Board shall provide a reasonable procedure for handling Participants' and Beneficiaries' claims for benefits. Such procedures, which shall be in accordance with governmental regulations, shall provide adequate written notice to any such person whose claim for benefits has been denied, stating the specific reasons for such denial in a manner calculated to be understood by such claimant, and shall afford a reasonable opportunity for a full and fair review by the Board. Such review procedure shall include provisions that a claimant or his duly authorized representative may:

(a) request a review upon written application to the Board;

(b) review pertinent documents; and

(c) submit issues and comments in writing; or

(d) appear before the Board.

No ruling of the Board in one case shall create a basis for retroactive adjustment in any other case.

TRW admits that the purpose of its claims procedure is to provide "an accessible avenue for challenging benefit denials based on plan interpretation." Defendant's Brief in Support of Cross–Motion for Summary Judgment, p. 11. The retirees, however, are not challenging TRW's interpretation of its amendments, but the amendments themselves. It would be completely futile to require the retirees to exhaust this administrative remedy. TRW would simply re-calculate their benefits as provided for in the 1988 amendment and reach the same result. Therefore, because the administrative process is futile, this Court, in its sound discretion, will not require the retirees to exhaust their administrative remedies before seeking relief in this Court.

### D. *Other ERISA claims*

 The retirees' second count alleges that TRW violated 29 U.S.C. § 1103(c) by using the assets of the plan to benefit TRW, rather than the plan's participants.[10] A decision by an employer which has the primary effect of benefiting the employees and has the incidental effect of being prudent from the employer's perspective does not violate § 1103(c). *Holliday v. Xerox Corp.,* 732 F.2d 548, 551 (6th Cir.1984),

---

**10.** 29 U.S.C. § 1103(c) provides, in part, that the "assets of a plan shall never inure to the benefit of any employer and shall be held for the exclu-

sive purposes of providing benefits to participants in the plan and their beneficiaries."

*cert. denied,* 469 U.S. 917, 105 S.Ct. 294, 83 L.Ed.2d 229 (1984).

The retirees have failed to either plead or come forward with facts to show that the computation of the lump sum distribution benefited TRW. In fact, the retirees admit that the funds remained within the plan and are still held in trust for the employees. Accordingly, Count II must be dismissed.

■ Similarly, Count III must also be dismissed. The retirees allege that the plan's administrator violated the fiduciary duties imposed by 29 U.S.C. § 1104 in calculating their lump sum distributions. Indeed, § 1104 requires a fiduciary to act solely in the interest of the plan's participants and beneficiaries. The retirees, in Count III, alleged that in calculating their benefits, TRW was motivated by profits and their own business interests, not the interests of the plan's participants.

In *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 140–142, 105 S.Ct. 3085, 3089–3090, 87 L.Ed.2d 96 (1985), the Supreme Court held that the administrator's fiduciary duty is to the plan as an entity, not to the particular participants. By serving the overall interests of the plan itself, the administrator serves the interests of all the plan's participants. While the retirees have shown that TRW denied them some money, they have failed to plead or present any facts to show that TRW acted imprudently or contrary to the interest of the plan as a whole. As was noted earlier, the retirees admit that the funds have remained within the plan, and thus inure to the benefit of all the plan's participants. Therefore, Count III must be dismissed.

## IV. RICO CLAIMS

■ The elements of a RICO claim remain the same regardless of whether it is brought as a criminal prosecution or as a civil suit. The only difference is the burden of proof—preponderance of the evidence in civil cases and beyond a reasonable doubt in criminal cases. *See Fleischhauer v. Feltner,* 879 F.2d 1290, 1296 (6th Cir.1989) *cert. denied,* 493 U.S. 1074 & ——, 110 S.Ct. 1122 & 1473, 107 L.Ed.2d 1029 & 108 L.Ed.2d 611 (1990) (preponderance of evidence and not clear and convincing evidence is proper burden of proof in RICO case with fraud as the predicate acts).

■ The retirees allege that the defendants have violated 18 U.S.C. §§ 1962(a) and (c). Both subsections require that a plaintiff plead and then prove the existence of both an enterprise and a pattern of racketeering activity. The retirees have failed to make any such pleading in their complaint or even raise the argument in their briefs. Accordingly, summary judgment is appropriate and the retirees' RICO claims, Counts IV and V, are dismissed.

## V.

Counts VI and VII of the complaint are state law claims based on state common law theories of misrepresentation and unjust enrichment. Both of these claims are based on the allegation that TRW failed to use the correct interest rate in calculating the retirees' lump sum distributions.

■ If ERISA provides a remedy for an alleged wrong, then the state claim is preempted by ERISA. *Perry v. P\*I\*E Nationwide,* 872 F.2d 157, 162 (6th Cir.1989). In *Perry,* the court found that claims based on fraud, misrepresentation, and promissory estoppel were not preempted by ERISA because the plaintiffs "do not seek plan benefits or an increase in plan benefits, rather, they seek not to be bound as participants and thus to recoup their wage reductions." *Id.* at 162.

Here, the retirees do seek an increase in plan benefits. Clearly, then, their state law claims are within the scope of ERISA and can be redressed by ERISA. Accordingly, the Court finds that the retirees' state law claims in Counts VI and VII are preempted.

## VI.

In conclusion, TRW's motion for summary judgment is granted in part and denied in part, and the retirees' motion for

summary judgment is granted in part and denied in part. In accordance with this opinion, this Court orders TRW to amend its plan to provide for the calculation of lump sum distributions from January 1, 1985 to October 22, 1986 in the following manner:

(1) The lump sum benefit shall be the present value of the monthly single life annuity, *including* any early retirement subsidy; and

(2) The present value shall be calculated by using an interest rate that is one hundred and twenty percent (120%) of the PBGC rate in effect at the time the distribution occurred, for lump sum amounts in excess of $25,000 (using the PBGC rate).

TRW is further ordered to re-calculate the retirees' lump sum distributions in the above manner, and provide them with any cumulative underpayment, with interest, that may result.

All of the retirees' remaining claims under ERISA, RICO, and state law are dismissed.

IT IS SO ORDERED.